FILED 20 JAN '26 16:51 USDC-ORP

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:24-cr-00353-AN |
| v. | SUPERSEDING INDICTMENT |
| YOLANDITA ANDRE and MARIE GERTRUDE JEAN VALMONT, | 18 U.S.C. § 2<br>18 U.S.C. § 1035<br>18 U.S.C. § 1349<br>18 U.S.C. § 1589(a)<br>18 U.S.C. § 1589(b)<br>18 U.S.C. § 1592<br>18 U.S.C. § 1594(b)<br>Forfeiture Allegation |
| Defendants. | |

THE GRAND JURY CHARGES:

AT TIMES RELEVANT TO THIS SUPERSEDING INDICTMENT:

Defendants and Relevant Entity

1. Defendant Yolandita Andre ("Andre") is a naturalized United States citizen and resident of Tigard, Oregon.

2. Marie Gertrude Jean Valmont ("Valmont") is a naturalized United States citizen and resident of Tigard, Oregon.

3. In December 2023, Andre and Valmont (collectively, the "Defendants") received a business license for Velida's Care Home LLC, an adult foster care facility operated in the Defendants' home with live-in adult residents with a business address of 9240 SW Omara Street, Tigard, Oregon 97223 (their home).

**Health Care Benefit Programs**

4. The Oregon Department of Human Services ("ODHS") is a federal and state funded insurance program that provides programs for aging and disabilities, child welfare, self-sufficiency, and vocational rehabilitation. It is the primary agency for human services, providing direct assistance to over one million Oregonians annually.

5. The Medicare Program ("Medicare") is a federal health care program, affecting commerce, that provides benefits to persons who are 65 years of age and older or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are referred to as Medicare beneficiaries.

6. Both Medicare and Medicaid are "Federal health care programs" as defined in Title 42, United States Code, Section 1320a-7b(f). ODHS, Medicare, and Medicaid are "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

7. Health care providers that render items or services to Medicare beneficiaries are referred to as Medicare providers ("Providers"). To participate in Medicare, Providers are required to submit an application. As provided in the application, every Provider is required to: (1) provide complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare

is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard for their truth or falsity. Providers are provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

8. If Medicare approves the application, Medicare assigns the Provider a Medicare Provider Identification Number ("PIN" or "provider number"). Providers assigned a Medicare PIN can submit claims for reimbursement to Medicare that include the PIN assigned to that Provider. Payments under Medicare are often made directly to the Provider rather than to a Medicare beneficiary. Payment typically occurs after Providers submit the claim to Medicare for payment, either directly or through a billing company.

9. Claims for Medicare are often required to set forth, among other things, the beneficiary's name, the date the items or services were provided, the cost of the items or services, the name and identification number of the physician or other health care provider who ordered the items or services, and the name and identification number of the provider who provided the items or services.

10. Medicare requires complete and accurate patient medical records reflecting the medical assessment and diagnoses of the patients, as well as records documenting actual treatment of the patients to whom services are provided and for whom claims for payment were submitted. Accurate records help ensure the appropriateness of payments to Providers.

11. The Consumer-Employed Provider Program is a Medicaid-funded program in Oregon that allows for in-home care of older adults and people with disabilities. It allows the consumer to stay at home rather than live in a facility. It also allows consumers to hire their own homecare workers, family members or career homecare workers through a database. Those homecare workers are then able to receive payment for the hours they care for the consumers.

12. Homecare workers are paid for providing certain approved Activities of Daily living (ADL) tasks, such as helping with bathing, dressing, grooming, hygiene, toileting, and eating. They can also aid in certain approved Instrumental Activities of Daily Living (IADLs), chores around the home such as housekeeping, laundry, meal preparation, and shopping. Additionally, homecare workers help with health-related tasks such as insulin injections, tube feeding, ventilator care, wound care, and testing blood sugars. For the homecare worker to receive payment, they must have spent their time providing approved ADLs to the consumer.

13. To be a consumer, an individual must be over the age of 65 or physically disabled. There are also additional criteria such as an income limit, asset limit, and that the applicant require a Nursing Facility Level of Care. Essentially, an applicant must undergo an assessment to determine their ability to complete ADLs and IADLs on their own. Following this assessment, the individual is given a service priority level of 1 to 18, with 1 being the highest level of assistance required. To qualify as a consumer for the Consumer-Employed Provider Program, the individual must receive a service priority level between 1 and 13.

14. To become a homecare worker, certain standards must be met such as they must be 18 years old, attend a mandatory orientation, have the skills knowledge and abilities to learn how to perform or perform the required work, complete an application packet, pass a background check, and sign a provider enrollment agreement. If an individual applies and is found to be qualified, then that individual will be assigned a provider number that allows them to both work and be paid.

15. Once someone becomes a consumer, they have a thorough interview with their case manager to assess the type and amount of help that they need. Based on that assessment, the case manager decides how many hours the consumer-employer can receive. The case manager also creates a service plan and a task list that outlines how many hours are authorized for each task. Homecare workers can only perform what is on the task list. Medicaid only pays homecare workers to do what is on that task list.

16. Homecare workers use a time keeping tool called the Electronic Visit Verification (EVV) or the Oregon Provider Time Capture Direct Care Innovations (OR PTC DCI) – a system used by the State of Oregon to track the time worked by homecare workers. This system is used for clocking in and clocking out. However, providers can also view, edit, and cancel their entries and add historical time entries.

17. Homecare workers put their hours in via the EVV or OR PTC DCI and those hours are processed by ODHS. The homecare workers are responsible to make sure that they are not claiming unauthorized overtime, that they are claiming the appropriate number of hours, and are accurately tracking their time. Once the hours are processed, the homecare

worker receives a remittance advice showing how much they were paid and who they worked for. They receive the funds in the form of a check or direct deposit.

18. The funds that are received by the homecare worker are Medicaid benefits that are authorized to be paid out for care of the consumer-employer. ODHS acts as the processor for those Medicaid funds.

19. A homecare worker can be terminated for several reasons. If they are terminated, they are disenrolled from the program and can no longer work as a homecare worker. Some of these violations are claiming hours that the homecare worker did not work, falsifying payment records, working unauthorized overtime, and failing to inform the Department and the consumer-employer within 14 days of being arrested for any potentially disqualifying crime. These crimes include all felonies and misdemeanors.

20. The provider agreement is signed by the homecare worker and acknowledges that they understand, among other things, that they must comply with investigations conducted by Adult Protective Services, that committing fraud will result in termination of their provider enrollment and number and that they could also be prosecuted. They also state that the following would qualify as fraud: billing for hours they did not work, billing for tasks they did not do, billing for tasks that are not listed on the task list as ADLs and IADLs, participating in a scheme that exaggerates or fabricates the consumer-employer's needs or the type of help they provide to them, that they cannot bill during times the consumer-employer is not eligible to bill for services, and they cannot bill for hours when they were not with the consumer-employer.

///

**The Scheme**

21. Defendants recruited Adult Victim 1 (AV-1), Adult Victim 2 (AV-2), and Minor Victim 1 (MV-1) (collectively, the "victims") to come to the United States from Haiti with promises of a nice place to live, steady and reliable work, and schooling opportunities for MV-1.

22. When the three victims arrived in the United States, the Defendants confiscated their immigration documents and had AV-1 and AV-2 work from approximately 6:00 a.m. until 11:00 p.m. in Velida's, the adult foster care facility operated in their home with live-in residents. MV-1 was also coerced into working in the home business on a part-time schedule.

23. The Defendants paid the victims little to nothing for their work in the home business, putting them in never-ending debt, while profiting from their free or almost free labor.

24. The three victims remained at the foster care home compelled to work for the Defendants out of fear of immigration, legal, or other serious harm if they attempted to leave.

25. While operating Velida's, Andre applied for and obtained Medicare funds she claimed were to pay for additional employees ("homecare workers") – including the victims – to care for patients ("consumers"). Although Andre received these additional Medicare payments, she paid the victims little or nothing from those funds.

26. From 2023 to 2024, Valmont qualified for hours that could be paid by Medicaid funds to a homecare worker. Andre was the homecare worker who she hired for her "care."

27. At the same time, Valmont was receiving "care" from Andre as a homecare worker, she was also listed caregiver on the schedule and plan of operation for Velida's. In fact, at times, she was listed as the sole caregiver at Velida's.

28. Andre utilized a punch system to record hours with ODHS that she alleged were for her care of Valmont.

29. During some of those hours, Valmont was at Velida's and caring for the residents.

30. Andre also requested ODHS to pay her for hours when she was not present with Valmont.

**COUNT 1**
**(Conspiracy to Commit Forced Labor)**
**(18 U.S.C. § 1594(b))**

31. The above Paragraphs are incorporated herein.

32. Beginning on or about September 8, 2023, and continuing to on or about July 24, 2024, in the District of Oregon, Defendants did knowingly conspire and agree with each other, and others unknown to the grand jury, to provide and obtain the labor and services of one and more persons by any means of, and by any combination of, the following means — (1) force, threats of force, physical restraint, and threats of physical restraint to that person and another person; (2) serious harm and threats of serious harm to that person and another person; (3) the abuse and threatened abuse of law and legal process; and (4) any scheme, plan, and pattern intended to cause the person to believe that, if the person did not perform such labor and services, that person and another person would suffer serious harm and physical restraint, in violation of 18 U.S.C. § 1594(b).

## THE OBJECT OF THE CONSPIRACY

33. The object of the conspiracy was for the Defendants to obtain the uncompensated labor and services of one and more persons in the District of Oregon and elsewhere, in violation of 18 U.S.C. § 1589.

## THE MANNER AND MEANS OF THE CONSPIRACY

34. The Defendants used false promises of work, education (as to MV-1), and stable housing to induce the victims to come to the United States.

35. Once in the United States, the Defendants controlled practically every aspect of the daily living of the victims.

36. When the victims arrived in the United States, the Defendants picked them up from the airport, took them to Velida's, confiscated their immigration documents, and had them start work immediately caring for the foster care residents living in the home.

37. The victims cared for the residents at Velida's by bathing them, dressing them, changing soiled diapers, spending time with them, and feeding them. The Defendants did not pay the victims at all for this work for the first few months and then later paid them $2/hour with deductions made for rent, utilities, and cell phones.

38. The victims were forced to ration the little food they were provided by the Defendants and berated if they ate anything not specifically allocated to them.

39. The Defendants created rules to control the victims and enforced those rules.

40. The Defendants isolated the victims from family and friends by prohibiting them from interacting with individuals outside of the home and monitoring their phone calls with family and friends.

41. The Defendants subjected the victims to terrible living conditions, making them sleep on the living room floor and monitoring their food intake.

42. If the victims complained, the Defendants would threaten deportation, yell, call them names, and remind them they had nowhere to go;

In violation of Title 18, United States Code, Section 1594(b).

**COUNTS 2 THROUGH 4**
**(Forced Labor)**
**(18 U.S.C. §§ 2, 1589(a), and 1589(b))**

43. The above Paragraphs are incorporated herein.

44. Beginning on or about September 8, 2023, and continuing to on or about July 24, 2024, in the District of Oregon, the Defendants, aiding and abetting one another, did knowingly (1) provide and obtain the labor and services of the victims referenced in each respective count below, whose identities are known to the grand jury, by any means of, and by any combination of, the following means—(a) force, threats of force, physical restraint, and threats of physical restraint to that person and another person; (b) serious harm and threats of serious harm to that person and another person; (c) the abuse and threatened abuse of law and legal process; and (d) any scheme, plan, and pattern intended to cause the person to believe that, if the person did not perform such labor and services, that person and another person would suffer serious harm and physical restraint, and (2) benefit, financially and by receiving one or more things of value from participation in a venture engaged in such acts, knowing and in reckless disregard of the fact that such venture had engaged in the providing and obtaining of labor and services by any of such means.

| COUNT | VICTIM |
|---|---|
| 2 | Adult Victim 1 (AV1) |
| 3 | Adult Victim 2 (AV2) |
| 4 | Minor Victim 1 (MV1) |

In violation of Title 18, United States Code, Sections 2, 1589(a), and 1589(b).

**COUNTS 5 THROUGH 7**
**(Document Servitude)**
**18. U.S.C. § 1592(a)**

45. The above Paragraphs are incorporated herein.

46. Beginning on or about September 8, 2023, and continuing to on or about July 24, 2024, in the District of Oregon, Valmont knowingly concealed, removed, confiscated, and possessed any one or more actual and purported passports and other immigration documents, and any other actual or purported government identification document, of one or more persons (a) in the course of one or more violations of Title 18, United States Code, Section 1589 and Title 18, United States Code, 1594(a), (b) with the intent to violate Title 18, United States Code, Section 1589, and (c) to prevent and restrict and to attempt to prevent and restrict, without lawful authority, one or more persons' liberty to move and travel, in order to maintain the labor and services of such persons, when such persons were and had been victims of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000.

In violation of Title 18, United States Code, Section 1592(a).

///

///

| COUNT | VICTIM |
|---|---|
| 5 | Adult Victim 1 (AV1) |
| 6 | Adult Victim 2 (AV2) |
| 7 | Minor Victim 1 (MV1) |

**COUNT 8**
**(Conspiracy to Commit Healthcare Fraud)**
**(18 U.S.C. § 1349)**

47. The above Paragraphs are incorporated herein.

48. Beginning on or about August 29, 2023, and continuing to on or about July 24, 2024, in the District of Oregon and elsewhere, defendants Andre and Valmont knowingly conspired and agreed with each other to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, as that term is defined under Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, any health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1349.

**THE OBJECT OF THE CONSPIRACY**

49. It was the purpose of the conspiracy for the Defendants to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims not provided as represented; (b) concealing the submission of false and fraudulent claims and the receipt and transfer of the proceeds from the fraud; and (c)

diverting proceeds of the fraud for the personal use and benefit of the Defendants, and to further the fraud in violation of Title 18, United States Code, Section 1349.

## THE MANNER AND MEANS OF THE CONSPIRACY

50. The manner and means used to carry out the conspiracy and scheme to defraud included, among others, the following:

51. The Defendants submitted and caused the submission of false and fraudulent application documents and other records to ODHS, Medicaid, and Medicare that misrepresented to ODHS and Medicare true information about the patients at Velida's, the home health care workers at Velida's, and the hours of care provided to the patients at Velida's.

52. Specifically, Andre requested Medicaid exemptions to obtain money under the guise that she needed more funds to obtain more employees or pay current employees for more hours to care for residents that she deemed to need "exceptional care." Reasons for exceptional care included "two-person care needs, wound care and behavioral."

53. Despite receiving these exceptional payments from Medicaid, Defendants did not pay and at times minimally paid AV1 and AV2.

54. In many cases, the Defendants received payment for Velida's work from ODHS and Medicare based on these false and fraudulent statements. ODHS and Medicare paid $9,627.00 in reliance on these false and fraudulent statements regarding Velida's. That money was paid to a bank account under the control of the Defendants.

55. To disguise and conceal the scheme, when health care regulators arrived to Velida's to perform inspections of the home, the Defendants instructed the victims to hide in a closet until the regulators left.

56. The government money obtained and spent by the Defendants in their home health care business included funds from ODHS and Medicaid.

57. Additionally, Valmont was deemed to be eligible under the Consumer-Employed Provider program and had approved hours that were allowed to be paid to a homecare worker. To become eligible, Valmont made statements in 2023 and 2024 to assessors and met with them claiming that she was disabled and needed the assistance of Andre as a homecare worker.

58. During 2023 and 2024, Valmont was listed as a caregiver at Velida's for the residents and, at times, was the sole caregiver for the residents. During some of those times, Andre claimed hours for Valmont's care – even though at those times Valmont was either caring for other residents or not with Andre.

59. ODHS processed these claims and paid out Medicaid funds to Andre on behalf of Valmont in reliance on the materially false information that was given by Andre. That money was paid to a bank account under the control of Andre.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 9-12
## (False Statements Regarding Healthcare Fraud)
## (18 U.S.C. § 1035)

60. The above Paragraphs are incorporated herein.

61. On or about the dates set forth below, in the District of Oregon, the Defendants, in connection with the delivery of and payment for health care benefits, items and services, and in a matter involving a health care benefit program affecting commerce, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents, as set forth below, knowing the same to contain materially false, fictitious, and fraudulent statements and entries:

| Count | Defendant | Dates of False Statement | Description of False Statement |
|---|---|---|---|
| 9 | Andre | ~~September~~ 2023 November AN | Andre submitted an application under penalty of perjury stating that only one victim was an occupant of Velida's when in fact all three victims lived in the residence. |
| 10 | Valmont | 2023-2024 | Valmont stated that she was disabled and needed Andre to be her paid health care worker while at the same time acting as an active and primary caregiver at Velida's. |
| 11 | Andre | March 20, 2024 | Andre requested payment for hours purportedly for caring for Valmont; however, this was a day when there was a surprise visit inspection and neither of the Defendants were at home and only arrived awhile after the inspectors came for the visit. |
| 12 | Andre | September 22, 2023 | Andre submitted an exceptional payment request on September 12, 2023 for the period of September 20, 2023 through May 31, 2024, but when inspectors went to the residence on September 22, 2023, she was not at the residence. |

Each of the above is a violation of Title 18, United States Code, Sections 1035 and 2.

## FIRST FORFEITURE ALLEGATION

Upon conviction of one or more of the offenses alleged in Counts 1 through 7 of this Indictment, defendants Yolandita Andre and Marie Gertrude Jean Valmont shall forfeit to

the United States, pursuant to 18 U.S.C. § 1594(d)(1), defendants' interest in any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of such violation, and any property traceable to such property, and pursuant to 18 U.S.C. § 1594(d)(2), any property, real or personal, constituting or derived from any proceeds that defendants obtained, directly or indirectly, as a result of such violation, or any property traceable to such property.

## SECOND FORFEITURE ALLEGATION

Upon conviction of one or more of the offenses alleged in Counts 8 through 13 of this Indictment, defendants Yolandita Andre and Marie Gertrude Jean Valmont shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

DATED: January 21, 2026.

A TRUE BILL.

OFFICIATING FOREPERSON

Presented by:

SCOTT E. BRADFORD
United States Attorney

ELIZA CARMEN RODRIGUEZ
Assistant United States Attorney

A. TYSEN DUVA
Assistant Attorney General
Department of Justice
Criminal Division

ELIZABETH ANNE HUTSON
Trial Attorney
Human Rights and Special Prosecutions Section